

November 28, 2022

<u>**VIA ECF**</u>
The Honorable Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

  Re: *United States v. James Mayo*, 20-cr-317

Dear Judge Swain:

 On December 9, 2022, defendant James Mayo will be sentenced by this Court for being a felon in possession of ammunition on May 30, 2020, in violation of 18 U.S.C § 922(g)(1).

 As video surveillance footage shows, Mr. Mayo's possession of ammunition arose out of a heated verbal dispute between Mr. Mayo's cousin and co-defendant, Jonathan Smith, and another group of individuals on May 30, 2020.  Mr. Mayo was not present when the argument began, and he joined the group without a weapon and in his slippers to come to the aid of his cousin, Mr. Smith.  As the argument escalated, some of the individuals advanced toward Mr. Mayo and Mr. Smith, and Mr. Smith drew a gun from his pocket in response.  One of the individuals ("Individual 1"), knocked Mr. Mayo into a pole and then threw him to the ground into a pile of broken furniture and garbage, causing Mr. Mayo to fall backwards into an inverted position, with his feet in the air.  Mr. Mayo managed to roll over and scramble to his feet, and shortly thereafter, in the heat of the moment, he grabbed the gun from Mr. Smith.  Mr. Mayo then confronted Individual 1, who stood his ground and did not retreat.  Mr. Mayo then aimed the gun down and away from Individual 1's vital organ, and pulled the trigger of the gun, injuring Individual' 1's finger.

 Mr. Mayo accepts full responsibility for his misconduct on May 30, 2020 and it is undisputed that his actions were inexcusable and they caused serious injury to Individual 1's finger.  The parties disagree, though, about how the offense should be characterized, and what cross-reference, if any, would be applicable in calculating Mr. Mayo's guidelines range under the Sentencing Guidelines.  The defense contends that a cross-reference to the aggravated assault guideline is appropriate, while the Government contends that a cross-reference to the attempted murder guideline is warranted.

 In connection with the sentencing of Jonathan Smith on January 28, 2022, this Court already carefully reviewed the video surveillance footage of the incident, and concluded that Mr. Mayo's conduct on May 30, 2020 amounted to "some form of aggravated assault," and not to attempted murder.  Nonetheless, the Government maintains that a cross-reference to the attempted murder guideline is appropriate here.  For the reasons articulated by the Court during

The Honorable Laura Taylor Swain
November 28, 2022                                                                                    Page 2

Mr. Smith's sentencing on January 28, 2022 and the additional reasons set forth below, the
defense urges the Court to apply the cross-reference to the aggravated assault guideline and not
to the attempted murder guideline, which would result in a guidelines range of 70 to 87 months
of imprisonment and not the higher 110 to 120 month imprisonment range the Government
proposes.

While Mr. Mayo's conduct was undoubtedly serious, the defense further urges the Court
to impose a below-guidelines sentence to account for the unprecedented, grueling conditions of
Mr. Mayo's confinement over the last two and a half years, and the extensive mitigating factors
in Mr. Mayo's background.

Mr. Mayo's childhood was marred by the guilt he continues to feel from when he
accidentally set a fire in his family's home when he was only 4 years old, leaving his family in a
homeless shelter for 2 years. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ The educational system also failed to provide Mr. Mayo with
the resources he needed to succeed████████████████████████████████████████████████████
██████████████████████████████████████

Mr. Mayo's father was also a crack addict, who severely neglected and then abandoned
his children, leaving Mr. Mayo's mother to raise them as a single mother. Mr. Mayo, the only
boy in the family with seven sisters, keenly felt his father's absence, and gravitated toward his
male cousins in his teen years as the only male role models in his life. Unfortunately, Mr.
Mayo's cousins lived in a dangerous neighborhood in the Bronx, where drugs and violence were
rampant. In this unhealthy environment, Mr. Mayo struggled with addiction, he was himself the
victim of serious violence at age 17, and he was traumatized when he lost multiple close friends
and family members to senseless violence at a young age. Mr. Mayo also became entangled
with the criminal justice system in a cycle, which he has previously found it difficult to break.

Since Mr. Mayo has been detained for this offense, though, he has had ample time for
reflection, and he is determined to break the cycle and plot a new course for himself, away from
the Bronx. Mr. Mayo's mother and several of his sisters have relocated to Maryland. As their
letters to the Court show, they have provided Mr. Mayo with unwavering support, and they have
committed to helping Mr. Mayo relocate to Maryland, to find employment and to transition to a
law-abiding life when he is released.

The hardships and trauma in Mr. Mayo's past, the grueling conditions of confinement
Mr. Mayo has endured while awaiting sentencing, and the promise in his future warrant a below-
guidelines sentence. Attached in support of Mr. Mayo's sentencing submission please find:
Exhibit A, an excerpt of the sentencing transcript of Mr. Mayo's co-defendant Jonathan Smith;
Exhibit B, letters from Mr. Mayo's family and friends; Exhibit C, email reflections from Mr.
Mayo to the Court; Exhibit D, an article about the Kolborne School, ███████████████████
███████████████████████████████████; Ex. E, an article about the death of Sienna
Edwards, a close friend of Mr. Mayo; Ex. F, an article about the death of Leonard Hines, Mr.
Mayo's cousin and Jonathan Smith's brother; Exhibit H, an article about the death of Jonathan

The Honorable Laura Taylor Swain
November 28, 2022                                                                                   Page 3

Jennings, a close friend of Mr. Mayo, in police custody; Exhibit H, surveillance video form the altercation on May 30, 2020; and Ex. I, a letter from counsel seeking medical treatment for Mr. Mayo.

## 1. Background

### a. Mr. Mayo's difficult childhood

James Mayo was born on December 30, 1989 to Audrey Headley and James Mayo Sr. in the Bronx.  Although he has seven maternal sisters, Mr. Mayo is Ms. Headley's only son.  Mr. Mayo Sr. was never a reliable presence or a strong father figure in Mr. Mayo's life.  Throughout Mr. Mayo's childhood, Mr. Mayo Sr. was addicted to crack, and would disappear for days or weeks at a time, spending his earnings on drugs instead of supporting his family.  As a result, Ms. Headley had to compensate, providing for the large family of eight children by working as a home health aide.

When Mr. Mayo was a young child, he lived in a crowded two-bedroom apartment with six of his sisters and his older sister's child – eight children altogether.  Ms. Headley slept in the living room, with the kids sharing the 2 bedrooms.  One day when Mr. Mayo was 4 years old and Ms. Headley was working across the street while his 15-year-old sister babysat, Mr. Mayo tried to light the stove and accidentally set the apartment he had lived in all of his life on fire, destroying the family's home and all of their belongings.  The children had to vacate the apartment through the fire escape.  Fortunately, none of the residents of the apartment building were killed or seriously injured, but the children were taken to the hospital to treat smoke inhalation and the family cat died in the fire.  As a result of the fire, Mr. Mayo's family had to move into a homeless shelter for two years until alternative housing could be found.  Although Mr. Mayo was only 4 years old when he accidentally set the fire, he felt deep shame for years about his role in the fire, and continues to feel responsible to this day.  Living in a shelter with his family for two years was a daily reminder that it was Mr. Mayo's own actions that had caused his family to lose their home.  Even though a 4 year old could not conceivably be held responsible for an accident that he inadvertently caused when he was being supervised by a 15 year old, this incident instilled in Mr. Mayo a belief that he was a "bad kid."

After two years in the shelter, during which time Mr. Mayo started kindergarten, Mr. Mayo and his family were placed into a housing project in the Bronx.  While the 5-bedroom apartment they were assigned gave the family much more space and privacy, the transition was emotionally difficult for Mr. Mayo, who was only six years old.  By that time, Mr. Mayo Sr. had entered into a new relationship.  While the young Mr. Mayo lived on the 5th floor with his mom and sisters, Mr. Mayo Sr. had moved in with a new girlfriend and her children on the 13th floor of the same building.  Still struggling with a crack addiction and immersed in his new relationship, Mr. Mayo Sr. was a visible presence to his kids, but he did not even acknowledge or engage with Mr. Mayo or his sisters when he saw them.  This led Mr. Mayo to feel an acute sense of abandonment, even though his father was nearby, which was particularly emotionally difficult because Mr. Mayo continued to idolize his father and longed for a connection with him. In a letter to the Court, Mr. Mayo's younger sister Miracle explains that "[t]hough everyone else

The Honorable Laura Taylor Swain
November 28, 2022                                                                 Page 4

saw that [Mr. Mayo] lacked a proper male role model, no one could tell James that our dad
wasn't worthy of his love and care."  Ex. B-1.

Ms. Headley was so concerned for her son's mental health and wellbeing living in the
same building as his father but having no real relationship with him that she applied to transfer to
a different housing project.  When Ms. Headley's request was denied because the emotional
distress her children were experiencing did not meet the criteria for a transfer, Ms. Headley made
the difficult decision to move the family back into a shelter.  She viewed a shelter as a better
alternative to the emotional distress Mr. Mayo and his sisters suffered living so close to their
father, without receiving any reciprocal love or attention.

   b.



After leaving the housing project in the Bronx, Mr. Mayo's family lived in a shelter for
another two years until Ms. Headley was able to move them to another apartment on Elder
Avenue in the Bronx, when Mr. Mayo was 11 or 12 years.  While the family had their own
space, they lived near a corner store, where there were always drug addicts hanging around.  Ms.
Headley was concerned about the drug addicts and violence in the neighborhood, and moved the
family to Mount Vernon when Mr. Mayo was 12 or 13 years old.

When Mr. Mayo was in middle school, he and a friend were playing rugby with a teacher
in the school, and the teacher fell and injured his head.  Although the teacher was friendly with

The Honorable Laura Taylor Swain
November 28, 2022                                                                                    Page 5

the boys and had been playing around with them and the injury was an accident, the school treated the incident as a disciplinary incident, and Mr. Mayo was kicked out of the school.  Mr. Mayo was then sent to the Kolburne School in New Marlborough, MA.  The Kolburne School was a year-round residential treatment facility for youth with special needs and behavioral and psychiatric disorders.  *See, e.g.*, Ex. D, Jenn Smith, *Kolburne School to close by end of June*, BERKSHIRE EAGLE, Apr. 15, 2012.  Mr. Mayo remained at the Kolburne School for two years, away from his family.  His older sister Imani is now a Behavioral ████████ working with kids with autism, and her career has given her new insight into her brother's struggles.  She writes that: "[t]his place was the place that I strongly believe broke my brother because since then, things were never the same.  He aged out and without the tools he needed to live a successful life and proper rehabilitation needed to heal from what he's been through, James made poor decisions."  B-3.

### c.  Mr. Mayo's turbulent and traumatic teenage and young adult years

When Mr. Mayo was around 16 years old, he briefly returned home to Mount Vernon from the Kolburne School.  Mr. Mayo looks at this time period as a regrettable turning point in his life, when he began following the wrong path and associating with the wrong people.

At 16 years old, Mr. Mayo was transitioning from a boy to a man, and he wanted to surround himself with other males instead of living at home with his mother and his sisters.  Mr. Mayo had lost faith in the educational system after his difficulties in school, and he dropped out of school in the 11th grade.  He then gravitated toward the Bronx, where his male cousins lived.[1] This included an older cousin, Thomas, Leonard Hines, and Mr. Mayo's co-defendant Jonathan Smith, who was a few years younger than Mr. Mayo.  Mr. Mayo's cousins and their friends provided him with the brotherhood that he was missing at home.  Unfortunately, the new circle of people Mr. Mayo associated himself with were involved with drugs and violence, and Mr. Mayo himself became a victim of the violence.  When he was just 17, Mr. Mayo was stabbed 12 times, he was hospitalized and he feared that he might lose his life.  PSR ¶ 64.

 Once he left home, Mr. Mayo did not have a stable place to live.  Although his mother would have offered him a home in Mount Vernon, since he decided to move to the Bronx to be closer to his male cousins, Mr. Mayo was essentially homeless by the time he was 17, hopping from couch to couch and apartment to apartment.

████████████████████████████████ Mr. Mayo also struggled with substance abuse that continued to plague him up through his arrest in this case.  Mr. Mayo began smoking marijuana when he was only 11 years old, and was smoking up to 15 marijuana cigarettes daily before his arrest.  Mr. Mayo also began drinking alcohol when he was 15 years old, and regularly consumed alcohol leading up to his arrest.  Mr. Mayo's addiction further negatively impacted his decision-making.

When he moved to the Bronx, Mr. Mayo also began to get in trouble with the law, including arrests for selling drugs, petit larceny and burglary.  PSR ¶¶ 38-41.  When Mr. Mayo

---

[1] Thomas and Leonard Hines and Jonathan Smith are his mother's, sister's grandchildren.

The Honorable Laura Taylor Swain
November 28, 2022                                                                                    Page 6

was 19 years old, he was arrested and pled guilty to attempted robbery in the second degree, and he was sentenced to 5 years of imprisonment.  While Mr. Mayo takes full responsibility for his participation in the attempted robbery, he was not the primary actor in the attempted robbery, which involved 2 other co-defendants.  However, Mr. Mayo was the only participant over age 18, and therefore he bore the brunt of the charges and faced the most serious sentence.

In the Bronx, Mr. Mayo was surrounded by drugs and violence, and he was traumatized by the loss of close friends and family to tragic violence at a young age.  This included the loss of a close friend whom Mr. Mayo considered family, Sienna Edwards, a young woman who was pushed off of a balcony and fell to her death at age 20.  *See, e.g.,* Ex. E, Al Baker and Daniel Krieger, *Arrest Made After Death of Woman Who Plummeted From 14th Floor Balcony*, N.Y. TIMES, Mar. 30, 2012.

When Mr. Mayo was still incarcerated for attempted robbery, his cousin, Leonard Hines, Jonathan Smith's older brother, was also murdered.  *See,* e.g., Ex. F, News 12 Staff, *Leonard Hines, of Yonkers, shot dead in the Bronx*, NEWS 12 WESTCHESTER, Jun. 5, 2014.  Leonard Hines was the same age as Mr. Mayo, and Mr. Mayo viewed Mr. Hines as not only his cousin, but his best friend.  Mr. Mayo was devastated by Leonard Hines's death and by the fact that he could not be with his family to mourn the loss because he was incarcerated.  As a result, after Mr. Mayo was released from prison, Mr. Mayo was very protective of Mr. Hines's younger brother, Jonathan Smith.  While this certainly does not excuse Mr. Mayo's conduct on May 30, 2020, it helps to explain why Mr. Mayo would join an ongoing argument to come to Mr. Smith's aid.

Just one week after Mr. Mayo was released from prison for attempted robbery on March 24, 2016, another close friend, Jonathan Jennings, who was only 19 years old, died tragically in police custody.  *See, e.g*., Ex. G, Natalie Musumeci, *19-year-old dies while in NYPD custody*, N.Y. POST, Apr. 1, 2016.  This was heartbreaking and destabilizing for Mr. Mayo.  To cope with his grief, Mr. Mayo turned to drugs to self-medicate, including the excessive use of marijuana, which he laced with angel dust.[2]  As a result of his grief and his drug abuse, Mr. Mayo had difficultly transitioning rom prison, correcting his course, and adhering to the terms of his parole, including reporting to his parole officer.  Mr. Mayo's parole was ultimately revoked, and he incurred additional charges while in custody.  PSR ¶¶ 42, 46.

After he was released from prison in June 2018, Mr. Mayo held temporary jobs, but he was struggling with excessive marijuana use, and he had difficulty finding stable employment as a felon without a high school degree.  He also returned to the Bronx, where he was living in May 2020, when the offense conduct took place, which further hampered his forward progress.

---

[2] While the Presentence Report notes that Mr. Mayo regularly laced marijuana with angel dust, his experimentation with angel dust was limited to the time period in his life shortly after Jonathan Jennings died.  PSR ¶¶ 69.

### d. Mr. Mayo's strong support network, his changed mindset, and his future goals

In the two and a half years since he has been incarcerated, Mr. Mayo has engaged in deep introspection, and he recognizes that the people he surrounded himself with in the Bronx have been negative influences, and he does not want to continue down the wrong path he started taking when he was 17 years old. Now almost 33 years old, Mr. Mayo wants much more for himself than continuous entanglement with the law and incarceration.

Mr. Mayo has turned to Christianity and creative writing to sustain him during his incarceration. His writings to the Court, attached as Exhibit C, show that he is sensitive, articulate and hopeful, and he has tremendous potential to write a new chapter in his life once he is released. They further show that he is committed to not letting the trauma and poor choices in his past define his future.

By way of example, in "THE SEEDS OF GROWTH," Mr. Mayo writes:

EVERY GARDENER KNOWS THAT BLOOMS GROW BEST IN GOOD SOIL.
EVEN BEFORE PLANTING, ITS GOOD PRACTICE TO PULL THE WEEDS OF
THE CONFUSED, BLINDED, LOST AND SELFISH ME, GIVING THE SEEDS OF
WHO I AM DESTINED TO BE THE OPTIMAL CONDITION IN WHICH TO GROW.
AS I TEND THE GARDEN OF MY CONSCIOUSNESS, I PULL THE WEEDS OF
WORRISOME AND UNFORGIVING THOUGHTS BY DENYING THEY HAVE
ANY POWER OVER ME.
I CREATED A FERTILE ENVIRONMENT FOR NEW POSTIVE THOUGHTS TO
GROW THROUGH REGULAR PRAYER AND MEDITATION.
AS I TOUCH THAT PLACE OF INFINITE STILLNESS AND PEACE, I AFFIRM
WHOLENESS, PROSPERITY, HAPPINESS AND SECURITY FOR MY LIFE.
LIKE BRIGHT BEAUTIFUL FLOWERS THESE POSTIVE THOUGHTS BLOOM
AND GROW IN MY CONSCIOUSNESS. Ex. C

In "I AM READY," Mr. Mayo expresses that he does not want to dwell on the past and has hope for the future:

I TOOK THE TIME TO REFLECT, AS I PREPARE MYSELF FOR THE LENTEN
SEASON.
I RECALL ALL THAT HAS BROUGHT ME TO THIS DAY.
SAVORING ALL THE GOOD AND GIVING [THANKS] FOR THOSE RICH
BLESSINGS.
I RELEASED ALL THE UNPLEASANT MEMORIES, ALSO GIVING THANKS FOR
THE LESSONS LEARNED AND OPPORTUNITIES FOR GROWTH.
I READY MY MIND AND HEART FOR NEW OPPORTUNITIES TO LIVE, GIVE
AND GROW AS I PREPARE MYSELF FOR THE OUTSIDE WOLRD.
I AFFIRM GENTLENESS, READY TO DO ALL THAT I AM GUIDED TO DO.
IN THIS CONSCIOUSNESS, I AM OPEN AND RECEPTIVE.

> MY MIND IS CLEAR, MY HEART IS LIGHT AND MY SOUL IS FINALLY FREE
> FORM ALL MY PAST BURDENS.
> I AM READY TO GROW, READY TO RECIEVE MY GOOD.
> EVEN THROUGH THE UNFORTUNITE CIRCUMSTANCES THAT IM IN,
> CELEBRATE ALL THAT I HAVE GROWN TO BE.
> I STEP FORWARD IN FAITH, OPENING MYSELFTO ABUNDANT BLESSINGS.
> Ex. C.

While he rebelled against his mother and his sisters as a teen and young man trying to find his way in the world, Mr. Mayo has come to realize the value of the love, support and stability of his mother and sisters. Mr. Mayo's mother and several of his sisters have relocated to Maryland. They live in close proximity to one another and they share a strong bond. When he is released, Mr. Mayo hopes to move to Maryland to be near his family. This would ensure that Mr. Mayo is not surrounded by the same negative influences in the Bronx that have stood in the way of his progress in the past.

Mr. Mayo's family has also observed his changed mindset, and in letters to the Court they have shown that they love and support Mr. Mayo and they are committed to helping him secure opportunities and to provide him with the resources and support he needs to stay on the right track.

Mr. Mayo's mother writes:

James has stated to me in letters and on the phone from prison that he is ready for change. With the support of this side of his family I know he would do great. He understands that he needs to change the people in his life, the place where he lives and his way. I believe his word and that if he is allowed to relocate to Maryland where I and many other members of my family live, he can get a job, education and housing. B-2.

Mr. Mayo's sister Miracle writes:

In more recent times when I was able to speak to James, he expressed that he'd like to start his own business creating a magazine, which I wholeheartedly believe he's very capable of accomplishing with the support system he has waiting for him on the outside. In addition to understanding and regretting his past mistakes, he is willing to learn from these mistakes and he wants to finally fully experience his life and his full potential. When he is released, he will have the support of those who love and care for him, as much as he has always loved and cared for others both deserving and undeserving. B-1.

Mr. Mayo's sister Imani also writes:

Speaking to [James], he is always hopeful and optimistic about changing and doing things better. I strongly believe he is more than capable of turning his life around. He has expressed the desire to want to be a better son, brother, and uncle. Furthermore, he has expressed the desire to want to be better for himself and build himself up to be the best he knows he can be.

The Honorable Laura Taylor Swain
November 28, 2022

Page 9

████████████████████████████████████████████

uch more accessible, James can finally take control over his own life and create new beginnings that were long overdue." B-3. These letters from Mr. Mayo himself and his family show that, even though he has struggled in the past, there are good reasons to be optimistic about Mr. Mayo's future.

## 2. The Offense Conduct and the Guidelines Calculation

Through a plea agreement dated March 28, 2022, Mr. Mayo entered a guilty plea to being a felon in possession of ammunition. The parties are in agreement that guideline § 2K2.1 applies to the offense, but disagree as to the offense level that should result from the application of § 2K2.1. The Government has taken the position that, under § 2K2.1(c)(1)(A), a cross reference to the attempted murder guideline is appropriate. The defense's position is that, to the extent a cross-reference is appropriate, the cross reference to the aggravated assault guideline would be the most appropriate guideline.

While the Government contends that a cross reference to the attempted murder guideline is appropriate, the Government's position is inconsistent with the facts and the law, including this Court's prior ruling after carefully considering the discovery in this case in connection with the sentencing of Mr. Smith, Mr. Mayo's co-defendant. The law and the facts are clear that Mr. Mayo's conduct amounts to, at most, aggravated assault and not to attempted murder. Accordingly, any cross-reference should be to § 2A2.2, the aggravated assault guideline, and not to the attempted murder guideline.

Surveillance video of the May 30, 2020 incident, attached at Exhibit H, shows that on May 30, 2020, Jonathan Smith, who can be seen on video in a white t-shirt and black pants, got into a heated verbal altercation on the street with a group of other individuals. Shortly thereafter, he briefly left the scene, retrieved a gun, and returned to the scene. *See* Ex. H at 00:10-1:10.

Mr. Mayo was not present when the altercation started, and he can be seen approaching the group from the left after Mr. Smith had already returned to the scene with a gun. *See* Ex. H at 1:30-1:43. When Mr. Mayo joined the group, Mr. Smith and the other individuals can be heard continuing their argument. Several of the individuals then advanced towards Mr. Mayo and Mr. Smith, and Mr. Mayo and Mr. Smith started backing away. At that point, Mr. Smith pulled the gun from his pocket and displayed it to the individuals who were advancing towards them. Two of the individuals continued to advance toward Mr. Mayo, who was walking backwards, and one of them, in red shorts with no shirt ("Individual 1"), began wrestling and pushing Mr. Mayo. Ex. H at 2:30-2:40. Individual 1 first pushed Mr. Mayo into a pole and then knocked Mr. Mayo off of his feet, pushing Mr. Mayo into a pile of broken furniture and garbage. This swiftly knocked Mr. Mayo off of his feet to the ground, with Mr. Mayo's head tilted backward and his feet over his head. While Mr. Mayo was on the ground in this vulnerable position, Mr. Smith pointed his gun at Individual 1 to try to get him to back off. While this did not cause Individual 1 to retreat, it gave Mr. Mayo time to roll over and scramble to his feet. *Id.*

The Honorable Laura Taylor Swain
November 28, 2022                                                                                   Page 10

Shortly thereafter, as Mr. Smith was backing away, Mr. Mayo reached for Mr. Smith's gun. Mr. Mayo then approached Individual 1 and fired the gun from a short distance away, aiming down, away from any vital organs, and injured Individual 1's finger. Ex. H at 2:50-2:54. Mr. Mayo and Mr. Smith then retreated off camera. Individual 1 can then be seen circling a red truck and aiming a firearm of his own in the direction of Mr. Mayo and Mr. Smith. Two shots can be heard on the video, but it is unclear from the video from which direction they came. It is clear from the video, though, that Mr. Mayo did not come anywhere close to hitting Individual 1 again.

During Mr. Smith's sentencing, this Court carefully considered the Government's argument that Mr. Mayo's conduct on May 30, 2020 amounted to attempted murder, and squarely rejected it. After reviewing the video, the Court concluded that Mr. Mayo's conduct amounted to "some form of aggravated assault." *See* Ex. A at 7. The Court reasoned that: "Mr. Mayo shot downward. The victim was a large ready target, and Mr. Mayo does not appear to have been aiming for a vital organ, nor did Mr. Mayo shoot again immediately when he apparently only hit the victim's hand." *Id*. The same careful analysis, based upon the same evidence, should apply here, at Mr. Mayo's sentencing. A cross-reference to the attempted murder guideline is simply not supported by the facts.

A cross-reference to the attempted murder guideline is also not supported by the law. The Government cannot establish by a preponderance of the evidence that Mr. Mayo intended to kill Individual 1 at all, much less in circumstances that would constitute attempted murder, as is its burden at sentencing. Unlike murder, "a specific intent to kill is an essential element" of attempted murder. *United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994); *see also Braxton v. United States*, 500 U.S. 344, 351 n.2 (1991) ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill.") (citations omitted). "The fact that a deadly weapon was used does not ipso facto prove the specific intent." *Kwong*, 14 F.3d at 194.

As this Court already concluded, the facts do not establish that Mr. Mayo ever formed a specific intent to kill. Mr. Mayo was standing in such close range to Individual 1 that if he intended to kill Individual 1, he had ample opportunity to do so with the first shot, which only hit Individual 1's finger. Moreover, even if he had misfired with the first shot, if Mr. Mayo had intended to kill Individual 1, he could have quickly followed up with a second shot when it was clear that Mr. Mayo only hit Individual 1's finger and Individual 1 was still in close range. That Mr. Mayo did not do so shows that he had no specific intent to kill.

Even if the Government could establish that Mr. Mayo intended to kill Individual 1, which, as this Court already ruled at Mr. Smith's sentencing, is a conclusion inconsistent with the evidence, Mr. Mayo's conduct would still not amount to second-degree attempted murder in light of the chaotic circumstances surrounding the encounter. Mr. Mayo's conduct in this case was clearly not premeditated. It is evident that Mr. Mayo entered the scene in the middle of an argument that he was not even initially a part of, and he carried no weapon with him. Indeed, Mr. Mayo was wearing slippers when he approached the group, and he can be seen kicking off

The Honorable Laura Taylor Swain
November 28, 2022                                                                                          Page 11

the slippers when the argument escalated.  Ex. H at 2:25-2:27.  Mr. Mayo's choice of footwear shows that he was not intending to engage in a physical altercation when he joined the group.

Instead, the argument escalated rapidly and unfolded unexpectedly.  When Mr. Mayo grabbed the gun, he was still reeling from moments before having been pushed into a pole and knocked clear off of his feet, and his actions arose in the heat of the moment.  Thus, "even if it could be established that [Mr. Mayo] deliberately attempted to kill" Individual 1, "the circumstances might very well reduce the crime to attempted manslaughter, since the facts clearly lend themselves to the argument that [Mr. Mayo] acted 'upon a sudden quarrel' rather than with any more thoughtful or malicious intent." *United States v. Jackson*, 351 F.Supp.2d 108, 116 (S.D.N.Y. 2004).[3]  The Government's argument for a cross-reference to the attempted murder guideline would thus fail even if the Government could establish that Mr. Mayo intended to kill Individual 1, which it cannot.  As this Court previously concluded, Mr. Mayo's conduct instead amounted to "some form of aggravated assault."  Ex. A at 7,

In the plea agreement, the parties agreed that, if the Court found that Mr. Mayo's conduct amounted to aggravated assault, Mr. Mayo's offense level would be 24, before acceptance of responsibility points were taken into account.  A cross-reference to the aggravated assault guideline under § 2A2.2 would result in a base offense level of 14, with 5 points added for the discharge of a firearm, and another enhancement of 5 points for serious bodily injury, which would result in an offense level of 24.  With three points off for acceptance of responsibility, Mr. Mayo's adjusted offense level would thus be 21.

In the plea agreement, the parties also agreed that, alternatively, Mr. Mayo's offense level would be 24 since Mr. Mayo had one prior felony conviction of a crime of violence, for second degree attempted robbery in violation of New York Penal Law §§ 160.10(2)(A) and 110.00. This would yield a base offense level of 20 plus 4 points for using ammunition in connection with another felony offense.  At the time of his plea, the law of the Second Circuit was that New York second degree attempted robbery was a "crime of violence."  *See, e.g.*, *United States v. Pereira-Gomez*, 903 F.3d 155, 166 (2d Cir. 2018) (holding that "attempted robbery under New York law is a "crime of violence" under the "force clause" of the Guidelines).  On June 21, 2022, after Mr. Mayo entered his plea, the Supreme Court decided *United States v. Taylor*, 142 S. Ct. 2015 (2022), which calls into doubt the Second Circuit's decision in *Pereira-Gomez*, and whether Mr. Mayo's attempted second degree robbery conviction still qualifies as a crime of violence.  *See Taylor*, 142 S.Ct. at 2020 (when analyzing attempted Hobbs Act Robbery, which is analogous to attempted New York robbery, holding that:  "to secure a conviction the government must show an intention to take property by force or threat, along with a substantial step toward achieving that object.  But an intention is just that, no more. And whatever a substantial step requires, it does not require the government to prove that the defendant used, attempted to use, or even threatened to use force against another person or his property.") Nonetheless, even if Mr. Mayo's attempted second-degree robbery conviction would no longer qualify as a crime of violence, and his base offense level under Guideline § 2K2.1 would be reduced to 14, Mr. Mayo's offense level would ultimately still be 24 before acceptance of responsibility points are deducted because, if Mr. Mayo's offense level under § 2K2.1 was lower

---

[3] Guideline §2A2.2 applies to both aggravated assault and attempted manslaughter.

The Honorable Laura Taylor Swain
November 28, 2022

than 24, the cross-reference to the aggravated assault guideline would apply, since it would yield the higher offense level of 24. *See* § 2K2.1(c)(1)(A). Mr. Mayo's adjusted offense level should thus be 21, regardless of whether the Court treats Mr. Mayo's second-degree attempted robbery conviction as a crime of violence.

With a criminal history category of V, Mr. Mayo's guidelines range would thus be 70-87 months, and not the higher guidelines range of 110 to 120 months urged by the Government.

There can be no dispute that Mr. Mayo engaged in very serious conduct when he injected himself into an escalating argument between Mr. Smith and Individual 1, and shot Individual 1 in the finger at close range, causing serious injury. Nonetheless, we urge the Court to apply the same analysis that it did in Mr. Smith's case, and to reject the Government's unsupported contention that Mr. Mayo's conduct amounted to attempted murder.

### 3. Mr. Mayo's confinement since 2020

Mr. Mayo was arrested for this offense on June 12, 2020, during the height of the pandemic, and he has been detained for the past two and half years under historically onerous conditions, making his pre-trial detention far more difficult than it would have been in ordinary times.

First, Mr. Mayo was detained at the MCC in Manhattan for over a year, until it had to be closed because the deplorable conditions at the facility were too pervasive to remedy while continuing to detain inmates. During the time Mr. Mayo was housed at the MCC, there were also two fires. Locked in, Mr. Mayo recalls seeing and smelling smoke coming through the vents and feeling trapped. During one of the fires, Mr. Mayo and his fellow inmates were detained in a smoke-filled room until the Fire Department ordered that they be moved to fresh air. Particularly for Mr. Mayo, who survived a house fire as a child that destroyed his home, suffering through two building fires while being detained and unable to protect himself was traumatizing.

For nearly a year and a half and periodically thereafter as outbreaks occurred, Mr. Mayo was also detained under strict lockdown conditions due to the COVID pandemic. He was only permitted to leave his cell for approximately 30 minutes a day. During this time, Mr. Mayo had to accomplish anything he needed to do, including showering, obtaining commissary items and communicating with family or counsel. Despite these restrictive measures, there were widespread COVID outbreaks at the MCC and MDC. Mr. Mayo himself is certain he contracted COVID, though it was not until weeks after he started feeling symptoms that he received any medical attention.

During the lockdowns, programming at the MCC and MDC was also severely restricted, and even now, after lockdown conditions have eased, there have been few programming opportunities offered and there has been a backlog of inmates looking to participate in them. Mr. Mayo has endeavored to take whatever programs have been made available to him. He took 40 hours of coursework to obtain his GED and he is waiting to take the test. He has also taken

The Honorable Laura Taylor Swain
November 28, 2022                                                                                      Page 13

additional programs, and is in the process of obtaining the certificates for these programs.[4]  In short, although the opportunities Mr. Mayo has had to better himself at the MCC and the MDC have been extremely limited, Mr. Mayo has tried to take advantage of whatever opportunities have been available.  He has also tried to improve himself by asking his family and friends to send him educational books, including self-help books and books about business to educate himself on trends in the outside world to prepare for his future.  Further, as noted above, he has focused on his writing and his faith to gain perspective, deal with his past traumas, and plan for his future.

During Mr. Mayo's detention at the MDC, there were also periodic outbreaks of serious violence amongst the inmates that the guards were unable to prevent.  Indeed, Mr. Mayo himself was stabbed multiple times by another inmate in an unprovoked encounter in October 2021.  His wounds were so serious that he had to be treated at the hospital, and his follow up care at the MDC was dismal.  Indeed, counsel visited Mr. Mayo in October 2021, shortly after the stabbing, and observed Mr. Mayo with open and untreated wounds, and had to request medical treatment to ensure that Mr. did not develop an infection.  Ex. I.

Admittedly, Mr. Mayo himself has also been disciplined in the two and a half years since he has been detained.  However, while the Presentence Report notes that Mr. Mayo has incurred 13 disciplinary infractions since he has been detained, that overstates the number of disciplinary incidents, as several involve the same incident on the same day.  *See* 7(e)-(g) (all 3 dated January 14, 2021); 7(h)-(i) (both from December 3, 2021); 7(j)-(l) (all 3 dated October 20, 2020).  Additionally, two of the incidents, reflected in Paragraphs 7(c) and (d), were for refusing a work order.  These incidents occurred when Mr. Mayo was not provided a mask to attend work during the pandemic and feared for his health.  Mr. Mayo has already been sanctioned for these incidents through the Bureau of Prisons.

While Mr. Mayo's disciplinary incidents are certainly a factor for the Court to consider, they do not outweigh the abysmal conditions of Mr. Mayo's detention, the fires and the stabbing he suffered while in Bureau of Prisons custody and the great strides Mr. Mayo has made while in custody to improve himself and prepare for his future.

### 4. The 3553 Factors Support a Below-Guidelines Sentence

The sentencing factors the Court must consider under 18 U.S.C. § 3553(a) include:  the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from future crimes of the defendant; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a).  In Mr. Mayo's case, the 3553(a) factors warrant a below-Guidelines sentence.

---

[4] We will provide the Court with any additional information we receive related to this programming.

The Honorable Laura Taylor Swain
November 28, 2022                                                                 Page 14

### a.  Mr. Mayo's history and characteristics warrant leniency

While there can be no disputing that Mr. Mayo has had multiple encounters with the criminal justice system and his conduct here was very serious, there are also numerous mitigating factors in Mr. Mayo's life that warrant leniency.

At just 4 years old, Mr. Mayo and his family became homeless for two years due to a tragic accidental fire that he has continued to blame himself for starting.  Mr. Mayo was effectively abandoned by his father, but the emotional damage was much more acute than if his father had simply disappeared, as Mr. Mayo actually had to see his father every single day for years, living with a new family in the same building, while ignoring Mr. Mayo.



. The failure of the schools Mr. Mayo attended to educate him turned Mr. Mayo off from both schooling , which left Mr. Mayo lacking the knowledge and treatment he needed to be successful.

To compensate for the absence of a father-figure in his life, Mr. Mayo turned to his male cousins in the Bronx, who introduced him to a life of drugs and violence that nearly killed him when he was 17, and took the lives of many of his loved ones.  Regrettably, Mr. Mayo got caught up in the cycle of drugs and criminality, and he has previously struggled to break free.

After much soul-searching over the past two and a half years, though, Mr. Mayo has come to his own realization that in order to leave his troubled past behind, he needs to leave the Bronx and the negative influences that have contributed to his continued involvement in criminal activity.  While Mr. Mayo previously resisted his mother's efforts to get him to move to Maryland to be near his sisters, Mr. Mayo now recognizes that living in Maryland would be the best environment for him to heal and succeed.  He has committed to self-improvement since he has been incarcerated, and as his writings show, he is determined that when he is released things will be different.

Mr. Mayo has also previously been stymied by his longstanding struggles with addiction.  Mr. Mayo has now realized that drug and alcohol use stood in his way of maintaining stable employment and creating opportunities for himself.  Mr. Mayo would welcome drug and alcohol treatment during his incarceration, and we request that the Court recommend that Mr. Mayo be permitted to participate in the RDAP program.  Mr. Mayo's participation in such programming would put him on much stronger footing to successfully rehabilitate when he is released from federal custody.

For these reasons, Mr. Mayo's history and characteristics warrant a below-guidelines sentence.

The Honorable Laura Taylor Swain
November 28, 2022                                                                                      Page 15

### b.  A below-Guidelines sentence would adequately punish Mr. Mayo

Mr. Mayo undoubtedly engaged in very serious conduct.  There can be no excuse for Mr. Mayo's actions in grabbing the gun from Jonathan Smith and shooting Individual 1 in the finger on May 30, 2020.  As the Court observed at Mr. Smith's sentencing, Mr. Mayo's conduct took place in the middle of the day on May 30, 2020, when there were numerous people out on the streets.  Mr. Mayo reacted to the quickly-unfolding situation out of confusion and anger, he was reckless, and he deeply regrets his actions.  The defense understands that a serious sentence is warranted.  Nonetheless, in light of the onerous conditions Mr. Mayo has already endured in pretrial detention for two and a half years, a below-Guidelines sentence would still be sufficient but not greater than necessary to serve the goals of sentencing.

During his two and a half years of detention, Mr. Mayo has endured continuous lockdowns, abysmal conditions in a correctional facility that had to be shuttered, multiple fires, a stabbing and substandard medical care.  Due to the pandemic and the backlogs in programming that have resulted, he has also had limited access to any programming that would have ordinarily been available to inmates detained pretrial.  A variance below the Guidelines is warranted to account for these harsh conditions of confinement.

Indeed, courts in this district have routinely granted variances to account for the grueling conditions of pretrial confinement at the MCC and the MDC during the pandemic.  *See, e.g.*, *United States v. Martinez*, 18 Cr. 669 (JPO) (SDNY) (time spent in detention during COVID equivalent to 1.5 to 2 times the normal time); *United States v. Cirino*, 19 Cr. 323 (JSR)(SDNY) (it is "fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor.  In effect, you are serving harder time every day you are in the federal prisons."); *United States v. Chavis*, 19-cr-620 (DLC), ECF No. 35 (S.D.N.Y. Aug. 14, 2020) ("I can't ignore that your time in prison has been even worse than it would otherwise be because of the pandemic"); *United States v. Rodriguez*, 19-cr-817 (LAK), ECF No. 45 (S.D.N.Y. Oct. 6, 2020) ("the conditions of incarceration to which you have been subjected because of the pandemic over much of the last ten or eleven months have really been very unusual and very harsh, all in the interest of preventing the spread of the disease. They are a lot worse than they would have been otherwise, and they are certainly a lot worse than if you had been serving a sentence.").  We urge the Court to similarly grant a variance in Mr. Mayo's case to account for the unusually harsh conditions of Mr. Mayo's confinement for such an extended period of time.

Thank you for your consideration.

Sincerely,

/s/ Kristen M. Santillo
Kristen M. Santillo
*Attorney for James Mayo*

Cc:     AUSA Thomas Wright

# EXHIBIT A

M1SBSMIS

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           20 Cr. 317 (LTS)

 5   JONATHAN SMITH,

 6

 7              Defendant.

 8                                           Sentence
     ------------------------------x
 9
                                             New York, N.Y.
10                                           January 28, 2022
                                             2:00 p.m.
11

12   Before:

13
                     HON. LAURA TAYLOR SWAIN,
14
                                             Chief Judge
15                        APPEARANCES

16   DAMIAN WILLIAMS
17        United States Attorney for the
          Southern District of New York
18   BY:  THOMAS JOHN WRIGHT
          Assistant United States Attorney
19
     MORVILLO, ABRAMOWITZ, GRAND, IASON & ANELLO, P.C.
20        Attorneys for Defendant
     BY:  ROBERT M RADICK
21        RUSSELL J. FELDMAN
          CHELSEA SCISM
22

23   Also Present: Detective Edward Hernandez, NYPD

24

25

M1SBSMIS

1          (Case called)

2          DEPUTY CLERK:  Counsel, would you kindly state your

3   appearances.

4

5          MR. WRIGHT:  Good afternoon, your Honor.

6          For the government, Assistant United States Attorney

7   Thomas John Wright. I'm joined, your Honor, at counsel table by

8   New York City Police Department Detective Edward Hernandez.

9          THE COURT:  Good afternoon, Mr. Wright and good

10  afternoon Detective Hernandez.

11         MR. RADICK:  Good afternoon, your Honor.

12         Robert Radick from the law firm Morvillo & Abramowitz.

13  At the far end of the table is my colleague Russell Feldman,

14  and in the first row of the pews is another colleague from my

15  firm Chelsea Scism.

16         THE COURT:  Good afternoon, Mr. Radick, Mr. Feldman,

17  Ms. Scism, and good afternoon Mr. Smith.

18         THE DEFENDANT:  Good afternoon.

19         THE COURT:  Mr. Smith, are there members of your

20  family and friends here in court today?

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  Good afternoon.  Thank you all for coming

23  to court today.  Please be seated everyone.  We are here today

24  for sentencing.  I remind everyone that this is a public

25  proceeding as is obvious.  As provided in the court standing

M1SBSMIS

1    order, neither recording nor retransmission of any part of this

2    proceeding is permitted.

3              Mr. Radick, have you been able to confer with

4    Mr. Smith prior to this hearing?

5              MR. RADICK:  Yes, I have, your Honor.

6              THE COURT:  Thank you.  You can be seated again.  I

7    have received and reviewed the presentence investigation report

8    which is dated July 13, 2021, including the recommendation and

9    addendum, as well as defense counsel's November 17, 2021 letter

10   submission which has been filed under seal pursuant to court

11   order and is accompanied by a letter from Mr. Smith, nine

12   letters of support from Mr. Smith's family and friends, two

13   video submissions that have been produced by the government in

14   discovery, a screenshot of one of the video submissions and a

15   transcript of a sentencing proceeding in another case in this

16   district, and my version had multiple copies of that

17   transcript, but it is the same transcript.

18             I've also received the government's letter submission

19   dated December 9, 2021 which is accompanied by three

20   surveillance camera recordings and a photo of an object that

21   the government proffers was found visible in Mr. Smith's cell

22   during his detention.

23             I've also received and reviewed two supplemental

24   letters from the government dated January 15, 2022 and January

25   26, 2022 and two supplemental letters from defense counsel

M1SBSMIS

1   dated January 25, 2022 and January 27, 2022.

2           Are there any other written submissions that the

3   parties intend for me to consider in connection with this

4   sentencing?

5           MR. WRIGHT:  No, your Honor.

6           THE COURT:  Thank you, Mr. Wright.

7           MR. RADICK:  Your Honor, there is one other submission

8   that the Court didn't mention which is a November 24, 2021

9   letter from the government indicating in response to an inquiry

10  from the Court that it does not believe and the parties don't

11  believe that a *Fatico* hearing is necessary.  That's one of the

12  submissions that came after our sentencing submission that I'm

13  sure the Court's considered.

14          THE COURT:  Yes, I have received and considered that,

15  and thank you for adding that reference to the list.

16          Mr. Wright, would you make a statement regarding the

17  government's victim identification analysis and notification

18  activities, if any, in connection with today's proceeding.

19          MR. WRIGHT:  Yes, your Honor.  The victim in this case

20  who was shot on the video that your Honor has reviewed, the

21  government has made multiple efforts to be in contact with that

22  individual, and those efforts have not been successful.

23          THE COURT:  Thank you.  Mr. Radick, have you read the

24  entire presentence report and the submissions and discussed

25  them with Mr. Smith?

M1SBSMIS

1            MR. RADICK:  Yes, your Honor.

2            THE COURT:  Mr. Smith, have you yourself reviewed the

3    entire presentence report?

4            THE DEFENDANT:  Yes, ma'am.

5            THE COURT:  Thank you.  And have you discussed the

6    presentence report and the submissions with your attorney?

7            THE DEFENDANT:  Yes, ma'am.

8            THE COURT:  Thank you.  Mr. Radick, does the defense

9    continue to press its arguments that the presentence report

10   improperly uses the cross reference provision of Guideline

11   Section 2K2.1(c) and 2X1.1 to apply the attempted murder

12   guideline and also contest the applicability of the four point

13   Guideline Section 2K2.1(b)(6) enhancement for transferred

14   ammunition with knowledge or reason to believe that the weapon

15   would be used in committing a felony in the event that the

16   Court determines that the cross reference is not applicable?

17           MR. RADICK:  Yes.  We maintain all of those

18   objections.

19           THE COURT:  And are there any other specific

20   objections or other issues with respect to the content of the

21   report that you would like to speak to further?

22           MR. RADICK:  No, your Honor.  Other than the

23   significant guidelines objections and differences, there are no

24   other issues with respect to the presentence report.

25           THE COURT:  Thank you.  Mr. Wright, does the

M1SBSMIS

1   government maintain the positions on these issues that I just

2   discussed with Mr. Radick that are laid out in the government's

3   supplemental submissions?

4          MR. WRIGHT:  Yes, your Honor.  And in that sense, we

5   have no objection to the PSR that is before the Court.

6          THE COURT:  Thank you.  Is the government applying,

7   Mr. Wright, to have the defendant, Mr. Smith, credited with the

8   third point for acceptance of responsibility?

9          MR. WRIGHT:  Yes, your Honor.

10         THE COURT:  That application is granted.  And the

11  third point is contemplated in the guideline computation in the

12  PSR.

13         And Mr. Wright, one more question, what is the

14  government's position with respect to restitution and

15  forfeiture in connection with this case?

16         MR. WRIGHT:  Your Honor, there is no forfeiture or

17  restitution sought.

18         THE COURT:  Thank you.  Therefore, there will not be

19  any restitution or forfeiture component of the sentence that is

20  imposed today.

21         Counsel, in the interest of candor and the efficient

22  use of our time in the sentencing proceeding, I want to give

23  you some information about the preliminary conclusion.  I want

24  to share with you, counsel, the preliminary conclusions that

25  I've reached on the basis of my study of the written

M1SBSMIS

submissions and multiple viewings of the video, and so I'll

share these, and then I will hear any further remarks that

counsel would like to make before finalizing any ruling.

First, I'm inclined to find that Mr. Smith after

initially resisting Mr. Mayo's efforts to take the gun from him

relented and voluntarily transferred the gun to Mr. Mayo.

Under the circumstances of the ongoing heated encounter and

Mr. Smith's prior brandishing of that same gun, the Court's

incline to find that it is more likely than not that Mr. Smith

knew or had reason to believe that Mr. Mayo would use the gun

to commit a felony offense.

The video does not, however, suffice to demonstrate by

a preponderance of the evidence that the intended felony was

murder.  Mr. Mayo shot downward.  The victim was a large ready

target, and Mr. Mayo does not appear to have been aiming for a

vital organ, nor did Mr. Mayo shoot again immediately when he

apparently only hit the victim's hand.

To the extent a particular felony can be inferred as

intended or one that Mr. Smith had reason to be believe would

be committed, it would be some form of aggravated assault.

Neither the government nor probation has advocated for the

application of the cross reference for aggravated assault which

would not appear to result in an offense level sufficiently

high to support the application of 2K2.1(c) in any event.

Second, the Court is also inclined to conclude that

M1SBSMIS

1    the base offense level applicable under Guideline Section

2    2K2.1(20), because the prior New York controlled substance

3    offense is not a controlled substance offense within the

4    meaning of the law now due to the 2015 removal naloxegol from

5    the federal controlled substance schedule.

6            The attempted robbery conviction must, on the other

7    hand, be treated as a crime of violence under relevant Second

8    Circuit law.

9            Third, for the reasons that I summarized a moment ago,

10   the four point enhancement would apply under Guideline Section

11   2K2.1(b)(6) because the evidence appears sufficient to

12   demonstrate by a preponderance that Mr. Smith knew or had

13   reason to believe that Mr. Mayo would use the gun to commit the

14   felony offense.

15           Now, counsel, I would invite you after whatever

16   moments of reflection you need to present any further arguments

17   that you may wish to make on these issues, and then the Court

18   will make firm rulings on the issues, and after those rulings

19   will go on to general sentencing arguments.

20           MR. RADICK:  Yes, your Honor.  Thank you very much.

21   It's very helpful to have the Court's views of the evidence and

22   guidelines to guide our comments here today.

23           I would like to begin by introducing specifically some

24   of the family members that your Honor has noted are here today

25   for Mr. Smith.  There are many, so I certainly won't try to

M1SBSMIS

1    name them all.

2           THE COURT:  Mr. Radick, just to make sure we're on the

3    same page.  Of course it's fine that you introduce everybody,

4    but this is about your only opportunity to speak to general

5    sentencing issues in context here.  I am focusing on making the

6    guideline application determinations.

7           MR. RADICK:  Absolutely.  In that case, your Honor, my

8    colleagues, as we indicated in an email to the Court, which I

9    hope your Honor has received or going to be addressing the

10   guideline issues that are still pertinent to the determination

11   based on what you said.

12          In light of that, I will pass the baton so to speak to

13   Mr. Feldman, and I will also step away from the table so that

14   Ms. Scism can take the seat and address some of the other

15   issues if that's all right with the Court.

16          THE COURT:  Yes.  Thank you.

17          Good afternoon, Mr. Feldman.

18          MR. FELDMAN:  Good afternoon, your Honor.

19          And can I just briefly discuss why the felony

20   possession guideline and not cross reference for attempted

21   murder are applicable in this case.

22          We're confident that your Honor's, as mentioned, has

23   watched the surveillance videos closely, but we want to point

24   out what the videos do not show.

25          THE COURT:  You do understand that I'm inclined to go

M1SBSMIS

1    your way?

2              MR. FELDMAN:  Yes.

3              THE COURT:  Okay.

4              MR. FELDMAN:  I'll briefly make some remarks about

5    that and then I'll move to the transfer issue and the cross

6    reference and Ms. Scism will handle the (b)(6)(b)reference.

7              Your Honor, briefly discussing the transfer issue that

8    you mentioned.  In our view, the video showed that Jonathan did

9    not transfer the firearm to the co-defendant as required under

10   the cross reference provision.  Transfer requires a voluntary

11   or intentional relinquishment.  We submit that the video

12   plainly shows that Jonathan did not do so.  He resisted his

13   co-defendant's efforts to obtain the gun, grabbing his arm,

14   turning away from him and moving his body to shield the weapon

15   further.

16             But even if your Honor believes that Jonathan did

17   transfer the gun, he did not possess the relevant intent.  The

18   language in the cross reference is designed to capture

19   circumstances for a defendant to provide the gun to his

20   co-defendant for a specific understood purpose.  As to the

21   shared intent, it is inappropriate to apply this provision.

22             On the facts here, Jonathan did not share

23   co-defendant's intent.  In a quickly unfolding conflict when

24   his co-defendant grabbed the weapon in a split second movement,

25   it was not possible for Jonathan to know his co-defendant's

M1SBSMIS

1    intent.  There's simply insufficient evidence for the Court to

2    conclude otherwise.

3              As the video clearly demonstrates, Jonathan's actions

4    were inconsistent with someone who intended to commit murder or

5    any other felony.  We submit that the *Jackson's* case applies

6    here, and we won't discuss it at length because of your Honor's

7    preliminary ruling.

8              I will at this time turn it over to my colleague

9    Ms. Scism to discuss (b)(6)(b).

10             THE COURT:  Ms. Scism.

11             MS. SCISM:  Good afternoon, your Honor.

12             In light of your view of the base offense level, I

13   will move pass that and not spend any time discussing it and

14   instead focus on the four level enhancement in (b)(6)(b).

15             As your Honor is aware, there are really two parts to

16   (b)(6)(b), whether Jonathan used or possessed the gun himself

17   in connection with another felony offense, or whether he

18   possessed or transferred it to his co-defendant in connection

19   with another felony offense.

20             It is our position that neither part of this --

21   neither clause rather of (b)(6)(b) applies to Jonathan.  As

22   Mr. Feldman touched on, we do not believe that Jonathan

23   intentionally transferred the weapon to his co-defendant.  He

24   tried to resist in the best way that he could given that there

25   was a gun in the situation.  And he could have perhaps run away

M1SBSMIS

1    or done something else, but he did his best to not transfer it.

2    He resisted.  He said hold on, and ultimately Mr. Mayo took the

3    gun.

4           We recognize that your Honor is not inclined to agree

5    with that understanding of the transfer.  So in the

6    alternative, we argue that even if you assume that Jonathan did

7    transfer the gun, he did not have the time or opportunity to

8    understand what his co-defendant would potentially do with it.

9    Everything was unfolding very rapidly, and it's just not clear

10   that Jonathan knew what Mr. Mayo would have done.

11          In addition, it's not obviously the case that Mr. Mayo

12   was going to commit a felony once he took the gun from

13   Jonathan.  He could have brandished it further.  He could have

14   pointed it at someone.  He could have done any option of things

15   that fall short of actually being a felony and shooting the gun

16   or hurting someone with the gun.

17          THE COURT:  Wasn't he pointing the gun at someone in a

18   threatening manner being potentially menacing even if he didn't

19   shooting the gun.

20          MS. SCISM:  I believe your Honor is correct that that

21   could be menacing, but under New York Penal Law Section 120.14,

22   that's actually a misdemeanor.  Same with potentially Reckless

23   Endangerment in the Second Degree, under New York Penal Law

24   120.20, that would also be a misdemeanor.

25          Finally, setting aside the transfer question focusing

M1SBSMIS

1    on what did Jonathan intend to do with the gun in the first

2    place when he used or possessed it.  We submit that Jonathan

3    was using the gun for self-defense.

4         Although he certainly could have walked away from the

5    situation, it is clear in the video that he did not bring the

6    gun back in order to hurt someone.  He didn't hurt someone.  He

7    used it at the point that he was vastly outnumbered.  He feared

8    for his safety, and he only got the gun after the argument had

9    escalated.  There were a lot of people.  It was him by himself.

10        And we would point your Honor to the Tenth Circuit

11   case of *Pantelakis* where the Tenth Circuit actually vacated the

12   sentence under what today is now (b)(6)(b) because the

13   defendant possessed an illegal gun with the full intent of

14   using it for self-defense.

15        There the court said that an intent to lawfully defend

16   oneself even with an unlawful weapon does not warrant the

17   enhancement.

18        THE COURT:  Just pause for one moment.  You may

19   continue.

20        MS. SCISM:  The final thing I'll mention is that in

21   addition to the things that Mr. Mayo potentially doing with the

22   gun only being misdemeanors.  The things that Jonathan did do

23   with the gun by having it in the first place would also only

24   rise to the level of a misdemeanor, and I'd be happy to answer

25   any questions that your Honor may have.

M1SBSMIS

1          THE COURT:  Thank you.  You've been very thorough.

2          MS. SCISM:  Thank you.

3          THE COURT:  Mr. Wright, would you like to be heard?

4          MR. WRIGHT:  Certainly, your Honor.

5          Your Honor obviously has considered what is a very

6     substantial record and zeroed in, in your assessment of the

7     issues at the outset on what were clearly the finest points in

8     dispute, and obviously the parties appreciate the amount of

9     time the Court has dedicated to the issues which were obviously

10    significant to both parties.

11         Your Honor, at the point of the shooting, taking

12    everything of course that the Court said and following it and

13    perceiving obviously the issues are in sharp dispute.  At the

14    time of course that Mr. Mayo shoots the victim and hits him

15    certainly in the hand as your Honor said, the victim's hand,

16    your Honor, is held up against the side of his body, a place

17    that if he had not had his hand there would have been shot into

18    the core of his body.

19         And the government respectfully submits that although

20    this is not, I think, a determinative issue with respect to

21    this defendant insofar as it is his intent at the point of

22    transfer that governs the issue, that does reflect upon what

23    the government perceives together with probation as, by a

24    preponderance, the clear intent of this gun being taken to

25    shoot someone at pointblank range.

M1SBSMIS

1        And that shooting at pointblank range under the

2   circumstances of a fight that had immediately preceded it was

3   one that was fairly anticipated, was shooting the person

4   without some sort of intermediate effort to scare or

5   intimidate.

6        And I think that it is then relevant, as we noted in a

7   footnote in our submission that sofar as the ex post facto

8   assessment of what this reflects upon the shared intent was

9   that the shot was fired at the body.  And when I say the body,

10  referring to the core of the person's body where his hand

11  happened to be held up against him at that time.

12       It was, I think, incredibly fortuitous that the victim

13  was shot in the hand and immediately shows that he was hit in

14  the hand at that time.

15       Following your Honor's view of the facts, obviously I

16  think that that one point, your Honor, was just one that I wish

17  to emphasize because I agree the fact that he is hit in the

18  hand is a significant fact.  But the fact that his hand is held

19  up against the side of his body when he is hit shows that

20  Mr. Mayo was shooting him, again into the core of his body.

21       And that shooting someone, your Honor, again to step

22  back from perhaps the finer points of the legal issue, shooting

23  someone at a distance of several feet into their body has to be

24  done with an intent that that person is going to die from being

25  shot there.  I think it's that dynamic that makes to the extent

M1SBSMIS

1    that there is an ex post facto reflection upon what was the

2    shared intent.  That, at that point, I think is of some

3    relevance.

4         Added to is the fact that as your Honor I believe

5    noted, the moment that this firearm is given by the defendant

6    to his co-defendant, he backs away.  And as your Honor knows

7    from the other surveillance video footage is running across and

8    around the street.  He knew exactly, your Honor, the government

9    respectfully submits, what his co-defendant was going to do

10   with that gun.  And what he was going to do with that gun is he

11   was going to use it against the victim.

12        Mr. Smith had no qualms about being present for

13   everything up to that point.  And everything up to that point

14   encompass all of the activity that is theorized as a potential

15   alternative.

16        And again it is from that perspective thinking about

17   what it means to shoot someone at pointblank range, by a

18   preponderance of the evidence, the government respectfully

19   submits that that shows quite powerfully that the defendant

20   transferred, that he gave that gun in plain language with the

21   expectations and knowledge and the intent that it was going to

22   be used to shoot that victim which is of course what happened.

23        Thank you.

24        THE COURT:  Thank you.  Let me just reflect a bit

25   further and then I will rule on these guidelines issues.

M1SBSMIS

1      MR. FELDMAN:  Your Honor, may I be heard for one

2  moment?

3      THE COURT:  Yes, Mr. Feldman.

4      MR. FELDMAN:  With respect to my friend on the other

5  side.  The defense submits that Mr. Mayo's shot here to the

6  victim in the hand is not consistent with an intent to murder.

7      Of course we're not here to defend Mr. Mayo, that's

8  for another day and another counsel.  But we submit that on the

9  record before us, that Mr. Mayo truly didn't possess the intent

10  to murder the victim.  He could have done a number of things,

11  including shooting a second shot at the victim, moving closer

12  to ensure that he hit the victim in the chest or head.  And

13  shooting once and hitting the victim in the hand is

14  respectfully not consistent with intent to kill.

15      With respect to Mr. Smith, he did not share, we submit,

16  Mr. Mayo's intent.  In fact, he didn't even know Mr. Mayo's

17  intent.  The transfer took place so quickly that Jonathan

18  simply did not have time to share or know what Mr. Mayo would

19  do with the weapon.

20      Thank you.

21      THE COURT:  Thank you.  Thank you for your patience.

22  I will now make the following findings and conclusions in

23  connection with the guideline application issues:

24      First, as to findings of fact.  Mr. Smith initially

25  resisted Mr. Mayo's efforts to take the gun from him, but then

M1SBSMIS

1    relented, and the Court finds voluntarily transferred the gun

2    to Mr. Mayo.

3           Under the circumstances of the ongoing heated

4    encounter and Mr. Smith's prior brandishing of that same gun,

5    the Court finds that the government has proven by a

6    preponderance that Mr. Smith knew or had reason to believe that

7    Mr. Mayo would use the gun to commit a felony offense,

8    specifically that he was likely to use the gun to hurt someone

9    by shooting them.

10           The video evidence does not, however, suffice to

11   demonstrate by a preponderance of the evidence that the

12   intended felony was murder.  Mr. Mayo shot downward.  The

13   victim was a large ready target.  And although the victim's

14   hand was near the middle to lower section of his body, it does

15   not appear to the Court that Mr. Mayo is shown to have been

16   aiming for vital organs.  And Mr. Mayo did not shoot again

17   immediately when he apparently only hit the victim's hand.

18           The fact that Mr. Mayo was close enough to have

19   attempted murder does not mean that Mr. Smith knew or had

20   reason to believe that the intended felony was attempted

21   murder.

22           Now as to the guidelines application, the conclusions

23   of law, the Court finds that the applicable base offense level

24   is -- I'm sorry, that the applicable guideline offense level is

25   21, and that with a Criminal History Criminal of IV, which is

M1SBSMIS

not disputed, the applicable sentencing guidelines range is 57

to 71 months for the following reasons:

First, the cross reference is not applicable because

the relevant crime to cross reference on the application of

2X1.1(a) would be aggravated assault and application of that

guideline would not yield an offense level greater than the

offense level determined under 2K2.1.

The provisions of 2K2.1, other than 2K2.1(c), and so

specifically the aggravated assault guideline under 2A2.2 calls

for a base level of 14, an enhancement of five for the

discharge of the weapon and another enhancement of five for

serious bodily injury, which would result in an offense level

of 24.

And here the 2K2.2 guidelines will, as I'll elaborate

in a moment, call for a base level of 20 and a four point

enhancement, which is also 24; however, the predicate for a

cross reference is not present, and we will proceed under 2K2.1

to determine the applicable guideline reference because I find

that the government has not proven that Mr. Smith knew that

Mr. Mayo would use the gun with an intent to kill.

As to the guideline computation under 2K2.1, the Court

finds that Mr. Smith has just one relevant prior offense, the

2013 conviction for attempted robbery.

The 2012 conviction for criminal sale of a controlled

substance in the third degree under New York Penal Law Section

M1SBSMIS

220.39 doesn't qualify as a controlled substance offense within the meaning of the guidelines, because as of today when I'm making the sentencing determination, the New York Law criminalizes conduct that is not criminalized by the federal statute.

Violation of the New York statute, therefore, under the required categorial analytical approach cannot serve to enhance the defendant's offense level under the sentencing guidelines. See *United States v. Swinton*, 495 F. Supp. 3d, 197 at 205 to 206, a decision from the Western District of New York in 2020, and *United States v. Townsend*, 897 F.3d, 66, 2018, Second Circuit decision.

The Court finds that an increase of the base offense level by four pursuant to Section 2K2.1(b)(6)of the guidelines is warranted because Mr. Smith possessed or transferred any firearm or ammunition with knowledge, intent or reason to believe that it would be used or possessed in connection with another felony offense.

The Court finds that Mr. Smith certainly had reason to believe that Mr. Mayo would use the gun and the ammunition therein against another individual when he relinquished it to Mr. Mayo, and that is certainly proven by a preponderance.

The Court also finds that that reason to believe would be sufficient to establish knowledge that the gun would be used given Mr. Mayo's education, deliberate taking of the gun, and

M1SBSMIS

1    the fact that Mr. Smith had already brandished the gun.  They

2    had been pursued, fallen down the altercation was continuing to

3    escalate.

4           And Mr. Smith also backed away from the scene

5    immediately after transferring the firearm indicating an

6    expectation of violence and ran away from the scene, and so the

7    Court finds that he expected that and certainly had reason to

8    believe that it would be used in a manner that would be hurtful

9    of another individual, although the video does not establish

10   that that intended injury would necessarily be attempted

11   murder.

12          So the offense level is 24, three levels are deducted

13   for acceptance of responsibility, and the guideline offense

14   level is therefore 21, and the Criminal History Category is IV

15          Thank you for bearing with that lengthy explanation.

16   The Court will direct that the presentence report be corrected

17   as follows:

18          In paragraph 25 of the presentence report which is

19   labeled base offense level, all of the text will be stricken

20   after the first sentence.  So the text beginning, pursuant to

21   the cross reference, and going all the way through the end of

22   that paragraph will be deleted, and the following language will

23   be substituted for it:

24          Because the defendant committed the offense after

25   sustaining one felony conviction of either a crime of violence

M1SBSMIS

1    or controlled substance offense, the base offense level is 20,

2    and the number 27 will be changed to the number 20.

3            Then in paragraph 26, after the words "specific

4    offense characteristics," the Court will direct probation to

5    pick up certain language from the footnote.  So in the footnote

6    midway through on the third line, there is language beginning,

7    pursuant to Section 2K2.1(b)(6)(b), because a firearm and

8    ammunition were possessed so on and so forth, the offense level

9    is increased by four levels.  That language will be brought up

10   into paragraph 26, and the plus two will be changed to plus

11   four.

12           On the next page paragraph 30, the number 29 will

13   change to 24.

14           In paragraph 34, the number 26 will change to 21.

15           And in paragraph 90, which is on page 23, the total

16   offense level reference will change from 26 to 21, and the

17   guideline range will change to 57 to 71 months.  That covers

18   all of the matters that we need to cover by way of edits to the

19   presentence report.

20           Now I invite counsel to speak generally to sentencing

21   issues.  Mr. Radick.

22           MR. RADICK:  Yes, your Honor.  Thank you.

23           So, your Honor, if I may, I'd like to return to where

24   I was initially starting, and I appreciate the Court's

25   resolution in a very thoughtful way of the guideline issues

# EXHIBIT B-1

The Honorable Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

     Re:  James Mayo

Dear Judge Swain:

     The purpose of this letter is to provide support and background about my older brother, Mr. James A. Mayo Jr.  James and I are sister and brother I have known him all of my life (31 years), ███ ████████████████████████████████████████████

     For the times I was able to experience my brother, we were like two peas in a pod. Of all 7 of my siblings (him being the only boy), despite the bumping heads that most all siblings face, he was my go-to person just for fun, laughs, a host of good times, and banter. James has always had the toughest exterior yet, a humble and sweetest interior, which is what I admired most about him. He'd give the shirt off his back for those he loved and cared for. I noticed that at a young age, even with our dad who was constantly in and out of our lives (more absent than present) growing up. Though everyone else saw that he lacked a proper male role model, no one could tell James that our dad wasn't worthy of his love and care. He'd go to bat for the very person whom he barely even knew but loved.  Even when he got in trouble I had a hard time viewing him as "bad" because I know my brother was as loving and gentle as ever, he was just wildly misunderstood.

     James faced a lot of challenges growing up, that I think really impacted his ability to get on the right track. ████████████████████████████████████████████████████████████████ I experienced visiting my brother, and he was unresponsive and incoherent due to the medication he was given. For me to merely see this was very traumatic.  I can only imagine what it was like to experience that as a child. Not until more recently in his adult years was he able to express to me how this experience affected him. Until this very day he is afraid of pills.  He could be in the worst pain possible and he just grins and bares it.

     In addition to hospitalization, James was separated from our family when he was sent away to the Kolburne School in Massachusetts for an incident that started out as horseplay and resulted in an accidental injury to a teacher when he was in public school during his teenage years in NYC. Although it was an accident, it was treated like a disciplinary incident.

     After he got back from the Kolburne School, his life has never been the same, and it only went downhill. I can't remember a consistent time after that I was able to spend with the brother I once admired so deeply. Unfortunately, he surrounded himself with bad influences who were never the people whom our mom chose for him to surround himself with, which led to his troubles with the law.

When I have had the chance to be with my brother, I've felt and experienced the same person I've always known him as and grown to love.



In more recent times when I was able to speak to James, he expressed that he'd like to start his own business creating a magazine, which I wholeheartedly believe he's very capable of accomplishing with the support system he has waiting for him on the outside. In addition to understanding and regretting his past mistakes, he is willing to learn from these mistakes and he wants to finally fully experience his life and his full potential. When he is released, he will have the support of those who love and care for him, as much as he has always loved and cared for others both deserving and undeserving.

It is my genuine prayer that the court takes this letter into deep consideration at the time of sentencing. Despite all adversities James has faced and the current case, I do believe James is ready and prepared for the next chapter of his life.

Thank you for your support of James Mayo.

Miracle Mayo
25, November  2022

# EXHIBIT B-2

The Honorable Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re:  James Mayo

Dear Judge Swain:

I am Audrey Headley, the mother of James. ███████████████████████ James has
had many struggles in life being my only son with seven sisters.  James always looked for a male
figure to be attached with because his father was not there for him.  His father was addicted to
drugs. With no attention from his father, James always hooked up with the wrong crowd.

James has stated to me in letters and on the phone from prison that he is ready for change.
With the support of this side of his family I know he would do great. He understands that he
needs to change the people in his life, the place where he lives and his way.  I believe his word
and that if he is allowed to relocate to Maryland where I and many other members of my family
live, he can get a job, education and housing.

James has expressed that he wants to be the son that I always wanted him to be.  I am
praying to God that I will see my son free while I am alive.

Thank you for reading this letter.

Audrey Healey
James Mayo's mother

# EXHIBIT B-3

November 27, 2022

The Honorable Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

   Re: James Mayo

Dear Judge Swain:

   My name is Imani Jaheem Mayo and I am a Behavior Specialist working with children diagnosed with autism. I am one of James Andrew Mayo Jr.'s older sisters. The purpose of this letter is to provide A character reference on behalf of my brother. As one of his older sisters, I have known James for 32 years.

   Throughout his life, James has been handed the short end of the stick.  As long as I can remember, James was never given the tools he needed to live a successful life. Being raised by a single mother and without a father, he was provided with little knowledge to be successful man in America. ███████████████████████████████████████████████████████████████████████████
I remember teachers telling my mother how great of a kid and how kind hearted my brother but he was not properly educated or given the resources that he needed for his individuality.  Since he was young, James was always the life of the party and made sure he put a smile on everyone's face. He went out his way to make jokes and do silly things to please those that surrounded him. He was always a joy to be around but it was apparent that he lacked something in his life.

   Being a black boy, with no father figure or role model to mimic the behaviors needed to be a model citizen, James was labeled "bad" because of the choices he made as a child.. Being kicked out of schools that failed to provide the resources that he needed to be educationally successful ██████████, only showed him that people didn't care to help. ████████████████████████████████████████████████████████████████████████ However, even then, James still tried to smile and make other people around him feel good.

   This all took a turn when doing what he loved, playing around with a favorite teacher of his turned into an incident where the teacher was injured ████████████████████████████████████████. This place was the place that I strongly believe broke my brother because since then, things were never the same.  He aged out and without the tools he needed to live a successful life and the proper rehabilitation needed to heal from what he's been through, James made poor decisions.

   Growing up in a family that was predominantly women (his mother and seven sisters), and James being the only boy without a consistent male role model in his life, he became another statistic. However, even then, he chose to smile and make people laugh and feel happy. Speaking to him, he is always hopeful and optimistic about changing and doing things better. I strongly believe he is more than

capable of turning his life around. He has expressed the desire to want to be a better son, brother, and uncle.  Furthermore, he has expressed the desire to want to be better for himself and build himself up to be the best he knows he can be. He is truly the man of the family and he is strongly needed. ███████ ██████████████████████████████████████████████████████████████████████, James can finally take control over his own life and create new beginnings that were long overdue..

Please take this letter into consideration at the time of sentencing. We all deserve a fair chance and to be given the proper tools to succeed. I believe he is ready and he now has the support of a loving resourceful family to back him up.

Thank you for your time.

Imani Mayo

# EXHIBIT B-4

 Gmail

**Kristen Santillo <ksantillo@gelbersantillo.com>**

## James Mayo
1 message

███████████████████████████                          Fri, Nov 25, 2022 at 10:52 AM
To: Ksantillo@gelbersantillo.com

To: Your honorable Laura Taylor-Swan

I am James Mayo second oldest sister, I know my brother have had his issues with the law but the little brother that I
know is protective of his sisters and mom ████████████████████████████████████████████My mom
████████████████████████████████████████████████████████████████████████████████mes was
████████████████████████████████████████████████████████████████████████████████o talk to
my brother he ask about my children, ask if my husband is treating me right etc. he has a heart for his family. When he
gets out, he will have the support and love he needs to get the second chance he never gotten as a child.

Thanks,
Mr & Mrs. Williams

# EXHIBIT B-5

 Gmail

Kristen Santillo <ksantillo@gelbersantillo.com>

---

## Mr.Mayo
1 message

███████████████████████     Fri, Nov 25, 2022 at 11:08 AM
To: Ksantillo@gelbersantillo.com

To Whom it May Concern,

I have been Mr. Mayo's friend for a little over 15 years.  I have seen him when he has been really good and had his mind right and I have seen him struggle, he has always came out on top. I have always watched him grow into a great human being. When he sets his mind to do something he goes about and does it. He is very loyal to his friends and family and has a great support system when he comes home. He has always had a great support system that has always pushed him to try to do the right thing and go the right path . When he comes home his family wil be helping him get back on his feet and help him get a job. When Mr. Mayo has a job he does the right thing he shows up and does what is asked of him. He might get side tracked at times and needs re-direction, but that's something we all do .

I hope this letter helps

If there are any questions please don't hesitate to reach out to me via email or phone

Aimee Friedman

██████████

# EXHIBIT C

TRULINCS  88025054 - MAYO, JAMES - Unit: BRO-G-C

--------------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO: THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 09:43:42 AM


{THE LENS OF FAITH}

I BEHOLD THE WORLD THROUGH THE LENS OF FAITH.
LIVING MY FAITH DOES NOT MEAN SEEING THE WORLD THROUGH ROSE-COLORED GLASSES.
INSTEAD IT MEANS TAKING AND HOLDING A HIGHER VIEW OF ALL CIRCUMSTANCES IN MY LIFE AND IN THE WORLD.
I BELIEVE IN THE POSSIBILITY OF PEACE,EVEN IN THE MIDST OF CONCLICT AND STRIFE.
I BELIEVE COMFORT IS AVAILIBLE IN THE PRESENCE OF PAIN AND GRIEF.
I BELIEVE HEALING IS POSSIBLE AMD WHOLENESS CAN BE REALIZED EVEN IN A STATE OF ILLNESS OR INJURY.
I AM FULLY IN THE WORLD,PRESENT TO ITS MORE TROUBLING AND WORRISOME CONDITIONS, AND YET I REMAIN
UNTROUBLED IN MIND,LIGHT IN HEART AND FREE IN SOUL.
USING FAITH AS THE LENS THROUGH WHICH I VIEW THE WORLD AND MY PLACE IN IT,I ATTUNE MYSELFTO A
GREATER REALITY.
I RELAX INTO GODS ADUNDANT GRACE,SECURE IN FAITH THAT ALL IS TRULY WELL.

TRULINCS  88025054 - MAYO, JAMES - Unit: BRO-G-C

----------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO: THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 07:54:40 AM

{GARDEN OF WEEDS}

WITH A READY MIND,I BEGIN MY LENTEN JOURNEY.
LENT,A SPIRITUALLY RICH PERIOD OF CONTEMPLATION AND DISCOVERY.
THE LENTEN SEASON IS FERTILE GROUND IN WHICH TO PLANT NEW SEEDS OF GROWTH.
AS I PULL THE UNWANTED WEEDS OF WHICH CONSTITUTES AS THE BLINDED,LOST,CONFUSED AND SELFISH ME
TO PLANT A BEAUTIFUL GARDEN,I GIVE UP NEGATIVE THINKING TO MAKE ROO IN MY CONSCIOUSNESS FOR
LOVING AND EMPOWERING THOUGHTS.
I ONCE LIVED LIFE WITH MANY INSECURITIES AND SELF-DOUBT BUT THROUGH TIME I'VE WORK TO OVERCOME
THEM SO I CAN BETTER LIVE FROM MY DIVINITY.
IF SOMEONE OR SOMETHING TRIGGERS AN ANGRY FLASH,HAVE LEARNED TO SEE THESE ENCOUNTERS AS AN
INVITATION TO FORGIVE.
AS I EMBARK UPON NY LENTEN JOURNEY TO PLANT MY SEEDS OF GROWTH,I AM MINDFUL THAT I AM NOT TRYING
TO BECOME SOMETHING IM NOT.
RATHER,I AM FREEING MYSELF TO BETTER EMBODY ALL THAT IM TRULY DESTINED TO BE.

TRULINCS  88025054 - MAYO, JAMES - Unit: BRO-G-C

---------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO: THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 08:05:07 AM

{ THE SEEDS OF GROWTH}

EVERY GARDENER KNOWS THAT BLOOMS GROW BEST IN GOOD SOIL.
EVEN BEFORE PLANTING,ITS GOOD PRACTICE TO PULL THE WEEDS OF THE CONFUSED,BLINDED,LOST AND
SELFISH ME,GIVING THE SEEDS OF WHO I AM DESTINED TO BE THE OPTIMAL CONDITION IN WHICH TO GROW.
AS I TEND THE GARDEN OF MY CONSCIOUSNESS,I PULL THE WEEDS OF WORRISOME AND UNFORGIVING
THOUGHTS BY DENYING THEY HAVE ANY POWER OVER ME.
I CREATED A FERTILE ENVIRONMENT FOR NEW POSTIVE THOUGHTS TO GROW THROUGH REGULAR PRAYER AND
MEDITATION.
AS I TOUCH THAT PLACE OF INFINITE STILLNESS AND PEACE ,I AFFIRM WHOLENESS,PROSPERITY,HAPPINESS AND
SECURITY FOR MY LIFE.
LIKE BRIGHT BEAUTIFUL FLOWERS THESE POSTIVE THOUGHTS BLOOM AND GROW IN MY CONSCIOUSNESS.

TRULINCS  88025054 - MAYO, JAMES - Unit: BRO-G-C

------------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO: THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 08:17:46 AM


{ I AM READY}

I TOOK THE TIME TO REFLECT,AS I PREPARE MYSELF FOR THE LENTEN SEASON.
I RECALL ALL THAT HAS BROUGHT ME TO THIS DAY.
SAVORING ALL THE GOOD AND GIVING THNKS FOR THOSE RICH BLESSINGS.
I RELEASED ALL THE UNPLEASANT MEMORIES,ALSO GIVING THANKS FOR THE LESSONS LEARNED AND
OPPORTUNITIES FOR GROWTH.
I READY MY MIND AND HEART FOR NEW OPPORTUNITIES TO LIVE,GIVE AND GROW AS I PREPARE MYSELF FOR
THE OUTSIDE WOLRD.
I AFFIRM GENTLENESS,READY TO DO ALL THATI AM GUIDED TO DO.
IN THIS CONSCIOUSNESS,I AM OPEN AND RECEPTIVE.
MY MIND IS CLEAR,MY HEART IS LIGHT AND MY SOUL IS FINALLY FREE FORM ALL MY PAST BURDENS.
I AM READY TO GROW,READY TO RECIEVE MY GOOD.
EVEN THROUGH THE UNFORTUNITE CIRCUMSTANCES THAT IM IN,CELEBRATE ALL THAT I HAVE GROWN TO BE.
I STEP FORWARD IN FAITH,OPENING MYSELFTO ABUNDANT BLESSINGS.

TRULINCS  88025054 - MAYO, JAMES - Unit: BRO-G-C

--------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO: THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 08:31:22 AM


{TRANQUIL STATE OF MIND}

TRANQUILITY EASES MY MIND,HEART,BODY AND SOUL.
REGARDLESS OF THE CIRCUMSTANCE THAT IM IN,HAVE LEARNED TO MAINTAIN A COMPOSED COUNTENANCE.
I STOP,TAKE A DEEP BREATH AND ENVISION A MOMENT OF A HAPPY TIME.
MY MIND IS TRANQUIL AND MY SOUL TRUSTS THAT ALL IS WORKING TOGETHER FOR THE GOOD.
MY NOW CALMAND STEADY MANNER BRINGS PEACE ALL AROUND ME.
I SEE ANY DISCORD AS AN OPPORTUNITY TO DEMONSTRATE MY TRANQUILITY THROUGH MY CALM BEARINGS.
WITH A RELAXED AND RESTED BODY AND PEACEFUL MIND,I TAKE UNEXPECTED DEVELOPMENT IN STRIDE.
I AM GRATEFUUL FOR THE ABILITY TO CHOOSE HARMONY EVEN IN THIS INHARMONIOUS SITUATION IM IN.
I END EACH DAY IN PEACEFUL,THANKFUL PRAYER.
I REST IN BLISSFULSTILLNESS,EELING THE WARNTH OF TRANQUILITY RUNNING THROUGH MY VAINS.

TRULINCS  88025054 - MAYO, JAMES - Unit: BRO-G-C

---------------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO: THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 09:08:48 AM


{UNERSTANDING OF SELF}

DEEPENING IN SELF-AWARENESS HELPED ME TO COME IN CONTACT WITH MY INNERSELF,WHICH LED ME TO KNOW GOD.
AS I PROGRESS ALONG THE WALK OF MY LENTEN JOURNEY,MY KNOWING UNDERSTANDING OF SELF HAS DEEPENED MY RELATIONSHIP WITH GOD.
AT TIMES GOD FELT FAR FROM ME AS A POWER AND PRESENCE OUTSIDE MYSELF.
AS I HAVE GROWN IN SELF-AWARENESS,I HAVE COME TO KNOW GOD AS THE ONE PRESENCE AND POWER WITHIN AND ALL AROUND ME.
A ENLIGHTEN SOURCE OF KNOWLEDGE,WISDOM,POWER,PEACE AND UNDERSTANDING.
A COMFORT AND HELP IN TIMES OF NEED.
AS I REFRESH MYSELF IN THE QUIET PRESENCE OF GOD,THERE IS NOTHING FOR ME TO DO OTHER THAN TO FEEL,KNOW AND UNDERSTAND.
NO LONGER DO I WALK AROUND WITH A CLOUDED MIND FULL OF RAGE,DISBELIEF AND NEGATIVE THOUGHTS,I NOW GREET THE DAYS WITH POSTIVE ENERGY AND CONFIDENCE KNOW GOD AS THE LIGHT IM MY MIND AND THE POWERING FACTOR OF KNOWING THAT WITH HIM I CAN OVERCOOME ANY OBSTACLE SET BEFORE ME.

TRULINCS 88025054 - MAYO, JAMES - Unit: BRO-G-C

---------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO: THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 09:21:47 AM

{PEACE BEGINS WITH SELF}

MY THOUGHTS GUIDE MY WORDS AND ACTIONS,SO I STRIVE TO KEEP THEM PEACEFUL AND POSITIVE.
WHEN I ENCOUNTER HURTFUL OR INCONSIDERATE BEHAVIOR MY RESPONSE AFFECTS NOT ONLY THE WELL
BEINGOF MYSELF BUT ALSO THAT OF OTHERS.
I'VE LEARNED TO KEEP MY YHOUGHTS PURE,POSITIVE AND PEACEFUL THROUGH MEDITATION AND PRAYER.
I AFFIRM I AM PEACE KNOWING THE TRANQUILITY OF MY SOUL KEEPS ME BALANCED AND CENTERED.
I AM A CONDUIT FOR PEACE,IT FLOWS FROM ME TO CREATE A WORLD OVERFLOWIMG WITH LOVING REVERENCE
FOR HUMANITY.
PEACE IN THE WORLD BEGINS WITH THE LOVE IN MY HEART.
I PRAY,BLESSING ALL THE WORLD'S PEOPLE AND RADIATING UNCONDITIONAL LOVE TO EVERY CORNER OF THE
PLANET.

TRULINCS  88025054 - MAYO, JAMES - Unit: BRO-G-C

------------------------------------------------------------------------------------------------------

FROM: 88025054
TO: Santillo, K
SUBJECT: TO; THE HONORABLE JUDGE SWAIN
DATE: 07/20/2022 09:57:35 AM

{FINALLY FREE}

EVEN HAD I REALIZED THAT I HAVE THE POWER TO DISCOVER WHO I AM AND TO THINK,SPEAK AND ACT IN WAYS
THAT ARE IN INTEGRITY WITH MY INNER-SELF.
REGARDLESS OF WHAT SHOWS UP IN MY LIFE,I'VE LEARNED THAT I MUST REMAIN OPEN TO OPPORTUNITIES TO
LIVE FROM MY BELIEFS AND VALUES.
I AM FREE TO CHANGE MY MIND ABOUT WHO I AM AND WHAT I WANT,NEED AND BELIEVE AS I LEARN AND GROW.
EVERY DAY ISEIZE THE OPPRTUNITY TO REMEMBER THERE ARE NO CHAINS THAT BIND MY INNER AND SPIRITUAL
SELF WHICH I BELIEVE IS MY DIVINE IDNETITY.
FREEDOM IS MY TRUE NATUTRE.
AT THIS LEVEL OG ENLIGHTENMENT,I AM TRULY LIMITLESS.
I FEEL MY INNATE FREEDOM MOST FULLY WHEN I ACKNOWLEDGE I ALWAYS HAVE CHIOCES ABOUT HOW I
EXPERIENCE THE CIRCUMSTANCES OF MY LIFE.

# EXHIBIT D

https://www.berkshireeagle.com/archives/kolburne-school-to-close-by-end-of-june/article_ab364367-fd5c-54d5-9ee0-0606d860f39a.html

# Kolburne School to close by end of June

By Jenn Smith, Berkshire Eagle Staff,
Apr 15, 2012

Sunday April 15, 2012

NEW MARLBOROUGH -- After nearly 44 years in the Berkshires and 65 years in existence, the Kolburne School is closing.

The news, which came from the school's board of directors, is forcing about four dozen students and 140 workers to find new places to go.

Kolburne will end its services on or around June 30, according to John DeAngelo, interim executive director and director of human resources.

"It was one of the most heart-wrenching things to communicate," DeAngelo told The Eagle this week.

He said that though the board has been ruminating the decision for a few months students, staff, parents and guardians, as well as social service agencies and partner schools, were notified two weeks ago.

No further public mention of the decision has been made. In fact the school's website still indicates that Kolburne is hiring for instructors, an assistant teacher and registered nurses.

According to a spokesman from the state Department of Elementary and Secondary Education, Kolburne officially notified the department on March 29 that it plans to close on June 30.

"The reasons given to us were financial difficulties coupled with declining enrollments," said JC Considine, DESE director of board and media relations.

The private, for-profit school, also known as Kolburne Therapeutic Com munities, currently serves about 47 students, between the ages of 9 and 21 years old.

"At one point we had 130 students," said Robin Wein stein Mallory, president of the Kolburne School Board of Directors.

Her grandfather, Luma Kolburne, and his wife Stella established Kolburne School on July 6, 1947, on a 20-acre estate in Norwalk, Conn., with the help of their daughter Jeane Kolburne Weinstein.

In 1968, Jeane and her husband Sydney Weinstein, decided to move the school to New Marlborough, and build a program on what today encompasses 800 acres and includes an educational center with classrooms and indoor swimming pool, a

residence hall, a remodeled barn as vocational center, and playgrounds, hiking trails and sports fields.

Over the years, Kolburne has offered 24/7 residential treatment facilities and special education programs, along with educators, staff and specialists, to youth with autism spectrum, trauma and trauma-related, neuro-developmental, pervasive developmental and/ or psychiatric disorders.

In December 2010, things began to change dramatically for the school, when it closed Caldwell House, a residential group home in Sheffield.

Sydney Weinstein passed away shortly thereafter in February 2011. On March 14, 2011, Jeane Weinstein retired as the school's executive director after being involved in a variety of capacities for 63 years.

On March 28, 2011, Dr. Neil Berger, who joined Kolburne School in 2005 as clinical director, was named by the board as executive director.

The school re-branded itself as Kolburne Therapeutic Communities around this time, and in April announced two new year-round respite care programs designed to provide temporary residential, therapeutic care to special needs children on either a planned or emergency basis.

Also during this time, Robin Mallory and her brother, Jonathan Weinstein, formed the limited liability company Weinstein Realty Manage ment LLC, and took on responsibility of the school's properties and mortgage agreements, becoming the sole stockholder of The Kolburne School Inc. An arrangement was made for Kolburne to lease property from Weinstein Realty Man agement LLC, on terms set to expire on June 30.

Meanwhile, in August 2011, Kolburne worked to progress as a school and received approval from the state to enhance its residential school program. This included a staff-to-student ratio of 1-to-3, new interventions and an autism curriculum, pre-vocational programming and more.

But during October 2011, Kolburne closed a second residential facility, Waldrum House, in Great Barrington. Berger left quietly in De cember, and Director of Hu man Resources John De Angelo was swiftly transitioned in as interim executive director.

"Right now, we don't know what we're going to do," said Mallory, when asked what will become of the hundreds of acres of property that will remain when the school operations shut down in a couple of months.

"Our main concern is helping students and staff. It's been a family business. We all grew up with the school. It's heart-wrenching because we're letting go some of the staff who were there when I was a teenager," she said.

DeAngelo said that Kol burne is currently planning a job fair for the school's staff in May, which will include potential employers as well as representatives from local and state agencies who provide transitional and unemployment services. A number of staff are members of the United Food and Commercial Workers Local 1459, which is based in Springfield.

In the meantime, Kolburne will continue to operate its two remaining facilities: the 800-acre Woodruff Campus in New Marlborough and the 34-acre Brigham Center in Lee.

"The two most important things right now," said DeAngelo, "are for us to provide the smoothest transition possible for the children for their next placement, and to support our staff."

To reach Jenn Smith:

jsmith@berkshireeagle.com,

or (413) 496-6239

On Twitter: @JennSmith_Ink

# EXHIBIT E

**The New York Times**

City Room
Blogging From the Five Boroughs

# Arrest Made After Death of Woman Who Plummeted From 14th-Floor Balcony

**By Al Baker and Daniel Krieger**   March 30, 2012 3:44 pm

**12:18 a.m. | Updated** The 911 operator knew immediately that the situation was serious. Whoever phoned for help was silent, but in the background, several female voices were making threats.

"You're not going to leave here alive; you're not going to leave here alive," the operator heard one of them say on Thursday night, according to an account of the call provided by the police.

As many as six threats were heard by the operator, who concluded that the caller was trying to alert the police without tipping off the others.

The operator dispatched a patrol car from the Police Department's 48th Precinct in the Bronx to the general vicinity, which the authorities had determined by zeroing in on the closest cell tower to the cellphone call's origin.

It was about 9:30 p.m., and sometime in the next few minutes, Sienna Edwards, 20, who the police now believe had made the 911 call, went off the balcony of a 14th-floor apartment at 750 East 179th Street in the Tremont section and hit the ground, where she died.

"She fell in the spot where I park my car," said Corey Childs, a resident of the building, who stood outside of it a day later describing the scene.

Near him, on the concrete spot where Ms. Edwards landed, some people had placed candles as a memorial.

For most of the day, detectives were trying to determine if they were faced with a homicide, an accident or a suicide, the police said. But by late Friday, the police said they had arrested Kenya Edmonds, 23, on charges of murder and manslaughter. Ms. Edmonds was described as an occupant of the apartment who had become "involved in a dispute inside of the apartment" with Ms. Edwards.

"This is a complex story," Police Commissioner Raymond W. Kelly said earlier in the day.

By early evening, detectives determined that Ms. Edwards had made two phone calls to friends, telling them that she was trying to escape from women who were trying to kill her.

"At this point, the detectives believe she may have fallen trying to get to the next balcony — climbing from one balcony to the next — trying to get away from the women who were threatening to kill her," said Paul J. Browne, the chief police spokesman.

The police said Friday night that at present Ms. Edmonds was the only person being charged.

Investigators had questioned three women from the apartment, 14B, after another 911 caller said a woman had suddenly come into the apartment and jumped, the police said.

It is not clear why the women in the apartment were apparently so upset at Ms. Edwards, who went there to deliver birthday gifts to the 3-year-old daughter of her boyfriend's cousin, the police said, whom she traveled with to the building. Mr. Browne said he did not think the victim had previously met the other women. They included the cousin's former girlfriend, who is the child's mother.

Detectives are investigating whether a domestic dispute played a role in the death.

An order of protection prohibited the cousin from having contact with his ex-girlfriend, the police said. As a result, the cousin remained downstairs while Ms. Edwards went up to the apartment.

When Ms. Edwards arrived, she was met by the former girlfriend, the former girlfriend's sister and a female friend of theirs, the police said. The little girl was in another room.

Trouble started, Mr. Kelly said, soon after Ms. Edwards got into the apartment. She then dialed 911, he said, "looking for help, but in the background there are voices that say, 'You're not going to leave here alive.' "

It was about 10 p.m. when the second 911 call came in, "from the apartment's occupant," he said.

The uniformed officers who were initially dispatched were about a block away when they were directed to the apartment after the second 911 call "reporting the jumper," Mr. Browne said.

People at the building on Friday said it seemed difficult to imagine someone falling from one of the upper floor's balconies.

One resident, Cheryl Thomas, said she was lying in bed in her third floor apartment on Thursday night when a loud "boom" caused her heart to race.

"It was so loud, I thought somebody threw a TV out the window," Ms. Thomas, 64, said as she stood near the parking lot. "It sounded like it hit the hood of a car."

Ms. Thomas then stepped onto her terrace and looked down. "I saw her laying there," she said. "She wasn't moving. She was out, completely out."

A man was running around yelling that the woman was his girlfriend, Ms. Thomas said, and a woman was saying that she was a cousin of the victim.

"Then I prayed for her," Ms. Thomas said. "Such a young girl like that. It's very tragic. I was shaking."

On Friday evening, Ms. Edwards's boyfriend, who identified himself as Timothy Smith, tried to make sense of what happened, saying that whoever was in the apartment probably mistook Ms. Edwards for his cousin's new girlfriend.

"She was doing a favor bringing a cake for my cousin's kid," he said. "She took care of me."

© 2017 The New York Times Company

# EXHIBIT F

 **news12**
WESTCHESTER

☾ **50°**

**WATCH LIVE**     NEWS     WEATHER     TEAM 12 INVESTIGATES     CRIME     THE REAL DEAL

# Leonard Hines, of Yonkers, shot dead in the Bronx

Jun 05, 2014, 9:09pm • *Updated on Jun 05, 2014*

By: **News 12 Staff**

A Yonkers man is dead after a shooting in the Bronx.

Police say Leonard Hines, 24, was shot in the chest last night on 187th Street.

A 17-year-old also was shot in the arm during the incident. He was taken to St. Barnabas Hospital and is listed in stable condition.

Police are searching for suspects, but no arrests have been made. They have not released a motive for the shooting.

**Share this story**



# EXHIBIT G



LOG IN

METRO

# 19-year-old dies while in NYPD custody

By Natalie Musumeci

April 1, 2016   4:06pm



Getty Images

A 19-year-old Bronx man died while in police custody after cops busted him for drugs Thursday, police said.

NYPD Bronx narcotics officers executing a search warrant at an apartment in Belmont on Lorillard Place near East 188th Street arrested Jonathan Jennings without incident after

# NEW YORK POST

LOG IN

While Jennings was seated and cuffed in an unmarked prisoner transportation van and being taken to the 48th Precinct station house, he began to experience "an apparent seizure," police said.

Jennings was taken to St. Barnabus Hospital where he was still conscious and alert.

While he was in the emergency room his physical condition started to worsen at around 9 a.m., according to cops.

Hospital staff then administered CPR on Jennings, but he could not be saved. He was pronounced dead the hospital.

Sources said the tentative cause of death is cardiac arrest.

The Medical Examiner will determine the official cause of death.

FILED UNDER    **DRUGS**  , _____ ,   **THE BRONX** _____    4/1/16

READ NEXT      **Dangerous ex-con preying on senior citizens: cops**

# AROUND THE WEB

Powered by ZergNet

# *RECOMMENDED FOR YOU*

# EXHIBIT H
# (Video will be provided
# to the Court.)

# EXHIBIT I

 **Gmail**

**Kristen Santillo <ksantillo@gelbersantillo.com>**

---

## Request for Medical Attention, James Mayo, 88025-054
1 message

---

**Kristen Santillo** <ksantillo@gelbersantillo.com>                                    Mon, Oct 18, 2021 at 7:18 AM
To: BRO-ExecAssistant@bop.gov
Cc: Nicole McFarland <nmcfarland@bop.gov>, Samuel Steinbock-Pratt <spratt@gelbersantillo.com>

Attached please find a letter requesting medical attention on behalf of James Mayo, Reg. No. 88025-054.

--

Sincerely,

GS GELBER +
SANTILLO

Kristen Santillo

347 West 36th Street, Suite 805
New York, NY 10018
**Tel**: 212-227-4743
**Fax**: 212-227-7371
**Email**: ksantillo@gelbersantillo.com

_____

This message is a PRIVILEGED AND CONFIDENTIAL communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

📄 **Letter Seeking Medical Attention.pdf**
124K



October 18, 2021

<u>**VIA EMAIL**</u>

Warden Heriberto Tellez
MDC Brooklyn
Metropolitan Detention Center
80 29th Street
Brooklyn, NY 11232

      **Re:**    **James Mayo, 88025-054**
             **Request for Medical Attention**

Dear Warden Tellez:

      I am an attorney representing James Mayo, Register No. 88025-054.  During a legal visit yesterday, I observed that Mr. Mayo had several open wounds that were not covered and could become infected.  I write to request that Mr. Mayo be given medical attention as soon as possible so that his wounds can be covered and treated so that he can heal and he does not develop an infection.  Thank you for your prompt attention to this request.  Please feel free to contact me at 917-715-2097 with any questions.

                Very truly yours,


                /s/ Kristen M. Santillo
                Kristen M. Santillo

Gelber & Santillo PLLC, 347 West 36th Street, Suite 805, New York, NY 10018
Tel: 212-227-4743 Fax: 212-227-7371